1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                            ----oo0oo----

11  UNITED STATES OF AMERICA,
                                        CR. NO. S-03-0144 WBS
12              Plaintiff,

13       v.                             MEMORANDUM
                                        RE: GROUPING OF COUNTS
14  CAROL ROTH,

15              Defendant.

16                            ----oo0oo----

17          At the sentencing hearing on September 14, 2005, this

18  court found, as part of its sentencing determination, that counts

19  1 and 2 are appropriately grouped pursuant to United States

20  Sentencing Guideline § 3D1.2.  The purpose of this memorandum is

21  to set forth the bases for that determination.

22  I. Relevant Facts

23          Defendant Roth has pleaded guilty to counts one and two

24  of the indictment against her.  The first count charges Roth with

25  conspiracy to distribute and to possess with intent to distribute

26  a controlled substance analogue to GHB in violation of 21 U.S.C.

27

28

1

1   §§ 846,[1] 813,[2] 841(a)(1),[3] and 841(b)(1)(C),[4] and 18 U.S.C. § 2.[5]

2   The second count charges her with conspiracy to distribute a

3

4

5       [1]     Any person who attempts or conspires to commit any
6               offense defined in this subchapter shall be subject to
                the same penalties as those prescribed for the offense,
7               the commission of which was the object of the attempt
                or conspiracy.
8
    21 U.S.C. § 846.
9
        [2]     A controlled substance analogue shall, to the extent
10              intended for human consumption, be treated, for the
                purposes of any Federal law as a controlled substance
11              in schedule I.

12  21 U.S.C. § 813.

13      [3]     Except as authorized by this subchapter, it shall be
                unlawful for any person knowingly or intentionally–
14
                (1) to manufacture, distribute, or dispense, or possess
15              with intent to manufacture, distribute, or dispense, a
                controlled substance. . . .
16
    21 U.S.C. § 841(a).
17
        [4]     In the case of a controlled substance in schedule I or
18              II, or 1 gram of flunitrazepam, except as provided in
                subparagraphs (A), (B), and (D), such person shall be
19              sentenced to a term of imprisonment of not more than 20
                years and if death or serious bodily injury results
20              from the use of such substance shall be sentenced to a
                term of imprisonment of not less than twenty years or
21              more than life . . .

22  21 U.S.C. § 841(b)(1)(C).

23      [5]     (a) Whoever commits an offense against the United
                States or aids, abets, counsels,
24              commands, induces, or procures its commission, is
                punishable as a principal.
25
                (b) Whoever willfully causes an act to be done which if
26              directly performed by him or another would be an
                offense against the United States, is punishable as a
27              principal.

28  18 U.S.C. § 2.

2

1  misbranded drug in violation of 21 U.S.C. §§ 331(a), 331(c),[6] and

2  333(a)(2),[7] and 18 U.S.C. §§ 2 and 371.[8]  Both counts involve

3  defendant Roth's distribution of 1, 4 butanediol, an analogue to

4  the schedule I controlled substance gammahydroxybutyric acid

5  (GHB) within the meaning of 21 U.S.C. § 802(32)(A).

6          Roth's co-defendant Shawn Gelegan purchased 1, 4

7  butanediol from "Miracle Cleaning Products" in Festus, Missouri.

8

_____

9      [6]     The following acts and the causing thereof are
               prohibited:
10
               (a) The introduction or delivery for introduction into
11             interstate commerce of any food, drug, device, or
               cosmetic that is adulterated or misbranded.
12
                 . . .
13
               (c) The receipt in interstate commerce of any food,
14             drug, device, or cosmetic that is adulterated or
               misbranded, and the delivery or proffered delivery
15             thereof for pay or otherwise.

16  21 U.S.C. § 331.

17      [7]     Notwithstanding the provisions of paragraph (1), if any
               person commits such a violation after a conviction of
18             him under this section has become final, or commits
               such a violation with the intent to defraud or mislead,
19             such person shall be imprisoned for not more than three
               years or fined not more than $10,000, or both.
20
    21 U.S.C. § 333(a)(2).
21
        [8]     If two or more persons conspire either to commit any
22             offense against the United States, or to defraud the
               United States, or any agency thereof in any manner or
23             for any purpose, and one or more such persons do any
               act to effect the object of the conspiracy, each shall
24             be fined under this title or imprisoned not more than
               five years, or both.
25
               If, however, the offense, the commission of which is
26             the object of the conspiracy, is a misdemeanor only,
               the punishment for such conspiracy shall not exceed the
27             maximum punishment provided for such misdemeanor.

28  18 U.S.C. § 371.

1 Gelegan repackaged the drug as "JetClean," and sold it to

2 individuals through his website.  (Plea Agreement App. A (Factual

3 Basis) at 1-2).  Roth, as Gelegan's live-in girlfriend, knowingly

4 participated in this scheme.  She repackaged and labeled the 1, 4

5 butanediol as "JetClean."   (Id. at 2).  She was aware that the

6 drug was intended for human consumption.  (Id.).  She received,

7 through her personal Paypal account, over $8,000 for the sale of

8 at least 652 ounces of 1, 4 butanediol.  (Id. at 3).

9        The appendix to the plea agreement states that the

10 labeling of "JetClean" as a purported ink jet cleaner, when it

11 was already intended for human consumption, was "intentionally

12 designed to defraud and/or mislead the government."  (Id. at 4).

13 Thus, the victim of the mislabeling was the United States

14 government.

15 II. Discussion

16        Defendant Roth argues that counts one and two should be

17 grouped pursuant to United States Sentencing Guideline

18 ("U.S.S.G.") § 3D1.2.[9]  Section 3D1.2's main requirement is that

19

---

20       [9]      All counts involving substantially the same harm shall
         be grouped together into a single Group.  Counts
21       involve substantially the same harm within the meaning
         of this rule:
22
         (a) When counts involve the same victim and the same
23       act or transaction.

24       (b) When counts involve the same victim and two or more
         acts or transactions connected by a common criminal
25       objective or constituting part of a common scheme or
         plan.
26
         (c) When one of the counts embodies conduct that is
27       treated as a specific offense characteristic in, or
         other adjustment to, the guideline applicable to
28       another of the counts.

4

1   the counts "involv[e] substantially the same harm."

2            Subsection (b) to U.S.S.G. § 3D1.2 is the subsection

3   most applicable to these facts.  Subsection (b) requires that the

4   counts: (1) involve the same victim; and (2) are connected by a

5   common criminal objective or constitute a common scheme or plan.

6   Subsection (b) does not require that the offenses charged consist

7   of the same elements for them to be grouped.  United States v.

8   Riviere, 924 F.2d 1289, 1306 (3d Cir. 1991)("The guidelines

9   anticipate that offenses requiring proof of different elements

10  will be grouped."); U.S.S.G. § 3D1.2, application Note

11  4("Subsection (b) provides that counts that are part of a single

12  course of conduct with a single criminal objective and represent

13  essentially one composite harm to the same victim are to be

14  grouped together, even if they constitute legally distinct

15  offenses occurring at different times.") (emphasis added).

16  Subsection (a) is not the best fit because misbranding requires a

17  physical act – putting the drugs into containers without the

18  required information – that is not an element of the distribution

19  of drugs count and could be performed at a time separate from the

20  time defendant delivered the drugs.  Thus, it would be inaccurate

21  to say that these counts involve "the same act or transaction."

22  See U.S.S.G. § 3D1.2(a).  The misbranding of drugs is not "a

23  specific offense characteristic in, or other adjustment to, the

24

25            (d) When the offense level is determined largely on the
             basis of the total amount of harm or loss, the quantity
26           of a substance involved, or some other measure of
             aggregate harm, or if the offense behavior is ongoing
27           or continuous in nature and the offense guideline is
             written to cover such behavior.

28  U.S.S.G. § 3D1.2

1 guideline applicable to" the drug distribution count.  <u>See</u>

2 U.S.S.G. § 3D1.2(c).[10]  Because the harm done by the conduct

3 charged in the two counts is measured in different ways (weight

4 and value), subsection (d) to U.S.S.G. § 3D1.2 does not apply.

5 <u>See United States v. Syrax</u>, 235 F.3d 422, 424 (9th Cir. 2000)

6 ("[G]rouping under section 3D1.2(d) is not appropriate when the

7 guidelines measure harm differently.") (quotation marks and

8 citation omitted).

9         The first question under U.S.S.G. § 3D1.2(b) is whether

10 the two counts involve crimes against the same victim.  The

11 victim of a violation of 21 U.S.C. § 841(a) is society at large.

12 "The societal interest directly threatened by violations of drugs

13 laws such as 21 U.S.C. § 841(a)(1) . . . is the interest in drug

14 abuse prevention."  <u>United States v. Nanthanseng</u>, 221 F.3d 1082,

15 1084 (9th Cir. 2000).  The victim of the crime of misbranding

16 drugs may be either an individual consumer or the government.

17 "Federal agencies may be the victims of fraud in counterfeiting

18 and misbranding drugs. . . . There is no meaningful distinction

19 between the government as victim and individual consumer victims;

20 <u>Bradshaw</u> held that it is possible for either or both to be

21

22     [10]   Defendant points out that "Count II is enhanced
pursuant to 2B1.1(b)(2) because of the dollar amount received for
the [drug]" and "Count I [is] . . . assigned an offense level
23 based on the weight of the substance."  "Given that the dollar
value is directly proportional to the weight or amount of the
24 substance sold," defendant concludes, "these are really two ways
of measuring the exact same thing."  (Def.'s Supp. Mem. at 8-9).
25 However, this reading is outside the heartland of  § 3D1.2(c),
which requires that "one of the counts embodies conduct that is
26 treated as a specific offense characteristic in or other
adjustment to, the guideline applicable to another of the
27 counts."  Misbranding a drug is not a specific offense
characteristic or other adjustment to the guideline applicable to
28 distributing that drug.

1  defrauded." <u>United States v. Cambra</u>, 933 F.2d 752, 756 (9th Cir.

2  1991)(citing <u>United States v. Bradshaw</u>, 840 F.2d 871 (11th Cir.

3  1988)).   Society at large has an interest in effective law

4  enforcement by the government.  <u>United States v. Kim</u>, 105 F.3d

5  1579, 1582 (9th Cir. 1997).

6           In <u>Bradshaw</u>, the defendant, like the defendant here,

7  was convicted of the distribution of misbranded substances with

8  the intent to defraud or mislead in violation of 21 U.S.C. §§ 331

9  and 333.  840 F.2d at 872.  Bradshaw was in the business of

10 selling steroids wholesale.  <u>Id.</u> at 873.  He misbranded his

11 packages as "Herbalife products" to avoid detection.  <u>Id.</u>  The

12 buyers to whom he sold the drugs knew they were steroids, and

13 therefore, defendant argued, he had not intended to defraud

14 anybody.  <u>Id.</u>  The court rejected defendant's argument, holding

15 that "[w]hen Bradshaw misled the governmental agencies, thereby

16 frustrating their efforts to protect the public, he indirectly

17 misled and defrauded the public.  Thus, Bradshaw's actions fell

18 squarely within the congressional purpose."  <u>Id.</u> at 874.

19           In this case, defendant Roth mislabeled the 1, 4

20 butanediol to evade detection by law enforcement.

21     Roth and [co-defendant] Gelegan took a number of affirmative
       steps which were intentionally designed to defraud and/or
22     mislead the government.  Among the many steps that Roth and
       Gelegan took to conceal their activity from law enforcement
23     and from the Federal Drug Administration ("FDA"), was: . . .
       the labeling of "Jet Clean" as a purported ink jet cleaner
24     when it was always intended for human consumption.

25 (Plea Agreement App.. A (Factual Basis) at 4; <u>see</u> <u>also</u> Pl.'s Am.

26 Response to Def.'s Sentencing Mem. at 14 ("the defendants

27 endeavored to avoid detection by the 'drug' provisions of the FDA

28 by labeling the substance which they distributed as 'ink jet

7

1 | cleaner.'"); id. at 9 ("The fact that defendant conspired with
2 | her co-defendant [to] . . . put false information on the bottles
3 | of the GHB analogue which they referred to as 'Jet Clean' a
4 | purported 'inkjet cleaner' show that it was her affirmative
5 | intent to conceal activity from the FDA.").  Therefore, the
6 | victim of defendant's misbranding was society at large, since
7 | society at large has an interest in effective law enforcement.
8 | See Kim, 105 F.3d at 1582.   The government now argues that,
9 | given the context of the sale through the anabolicextreme.com
10 | website, a site dedicated to body building, the victims of the
11 | misbranding were Roth's and Gelegan's customers.  "[T]he
12 | consumers of this product ostensibly ingested the product
13 | believing that it would enhance their physical performance."
14 | (Pl.'s Am. Response to Def.'s Sentencing Mem. at 13-14).
15 | However, if defendant's customers had such a belief, it was not
16 | due to defendant's misbranding the drug.  Defendant misbranded
17 | the drugs as "ink jet cleaner," not as a steroid or performance
18 | enhancer.  Further, while it is true that the consumers of the
19 | product did not have documents indicating the proper dosage,
20 | possible side effects and other dangers associated with 1, 4
21 | butanediol, the same could be said of consumers of any other
22 | street drug.  A purchaser of cocaine or heroin also does not have
23 | that valuable information.  Yet it would be extremely unusual,
24 | for example, to charge a defendant with the misbranding of heroin
25 | in addition to the sale of heroin.  The point is that the main
26 | impetus behind the misbranding count seems to be to specifically
27 | and generally deter criminal deception of the FDA and law
28 | enforcement effected by misbranding an illegal controlled

1   substance as a legal cleaning solvent.

2           "'Where society at large is the victim,' the sentencing

3   court must go on to determine whether 'the societal <u>interests</u>

4   that are harmed are <u>closely related</u>.'"  <u>Nathanseng</u>, 221 F.3d at

5   1084 (quoting U.S.S.G. § 3D1.2 application note 2).[11]  There does

6   not seem to be any case addressing the grouping of misbranding

7   and drug distribution counts.  The case most on point is <u>United

8   States v. Lopez</u>, 104 F.3d 1149 (9th Cir. 1997).  In that case,

9   the defendant was convicted of money laundering and conspiracy to

10  distribute marijuana and cocaine.  <u>Id.</u> at 1150.  The issue before

11  the appellate court was whether those counts should be grouped

12  for purposes of sentencing.  The court first noted that

13  "[v]ictimless crimes, such as those involved here, are treated as

14  involving the same victim when the societal interests that are

15  harmed are closely related."  <u>Id.</u>  The court held that "[t]he

16  societal interests harmed by money laundering and drug

17  trafficking are closely related . . . Lopez laundered money to

18  conceal the conspiracy's drug trafficking and thus facilitated

19  the accomplishment of the conspiracy's ultimate objective of

20  obtaining the financial benefits of drug trafficking."  <u>Id.</u> at

21  1150-51.

---

23  [11]        . . . For offenses in which there are no identifiable
            victims (<u>e.g.</u>, drug or immigration offenses, where
            society at large is the victim), the "victim" for
24          purposes of subsections (a) and (b) is the societal
            interest that is harmed.  In such cases, the counts are
25          grouped together when the societal interests that are
            harmed are closely related. . . . Ambiguities should be
26          resolved in accordance with the purpose of this section
            as stated in the lead paragraph, <u>i.e.</u>, to identify and
27          group "counts involving substantially the same harm."

28  U.S.S.G. § 3D1.2, application note 2.

1           Similarly, in this case, Roth misbranded drugs to

2    conceal the conspiracy's drug trafficking and thus facilitated

3    the accomplishment of the conspiracy's ultimate objective of

4    obtaining the financial benefits of drug trafficking.  Therefore,

5    the counts should be grouped.  This conclusion is bolstered by

6    application notes 2 and 4 to U.S.S.G. § 3D1.2.  Example (3) in

7    application note 4 provides: "The defendant is convicted of one

8    count of auto theft and one count of altering the vehicle

9    identification number of the car he stole.  The counts are to be

10   grouped together."  The alteration of the vehicle identification

11   number is presumably performed to evade law enforcement, although

12   technically the victim of the alteration of a VIN is probably the

13   same as the victim of the theft itself given the example's

14   inclusion in application note 4.  See 18 U.S.C. § 511 (providing

15   as one of its elements that the alteration of the VIN be

16   performed "with intent to further the theft of a motor vehicle").

17   An example given in application Note 2 to U.S.S.G. § 3D1.2 is

18   also analogous: "Where one count, for example, involves

19   unlawfully entering the United States and the other involves

20   possession of fraudulent evidence of citizenship, the counts are

21   grouped together because the societal interests harmed . . . are

22   closely related."  An illegal immigrant presumably possesses

23   fraudulent papers to assist him in evading law enforcement and

24   achieving his ultimate goal of unlawful entry.  Analogous to the

25   examples given in application Notes 2 and 4 are the facts here:

26   defendants Roth and Gelegan mislabeled the 1, 4 butanediol as a

27   cleaning substance to avoid detection for as long as possible so

28   as to facilitate achievement of the ultimate goal of making money

                                   10

from the sale of the drug.

The government argues that <u>United States v. Barron-Rivera</u> controls this case.  <u>See</u> 922 F.2d 549 (9th Cir. 1991).  It does not.  In that case, Barron-Rivera was found guilty of (1) being an alien unlawfully in the United States after deportation; (2) being an illegal alien in possession of a firearm; and (3) being a felon in possession of a firearm.  <u>Id.</u> at 551.  The district court grouped Barron-Rivera's two firearm possession convictions into one offense group, and treated the conviction for being an illegal alien after deportation as a separate offense category.  <u>Id.</u> at 554.  Barron-Rivera argued that all three counts should have been grouped.  The appellate panel disagreed, finding that the result of Barron-Rivera's bootstrapping theory would be to "combine two dissimilar offenses: being an illegal alien in the United States after deportation and being a felon in possession of a firearm."  <u>Id.</u>[12] Unlike <u>Lopez</u> and the present case, it cannot be said that Barron-Rivera's possession of a firearm somehow helped him to evade detection as an illegal immigrant.  Therefore, <u>Lopez</u> offers better guidance.

Further, the similarity of the offenses in this case – the sale and misbranding of an illegal drug, both of which offenses are completed upon distribution to customers – provides another reason why <u>Barron-Rivera</u> is not the precedent to which the court should look.  <u>Compare</u> 21 U.S.C. § 331 (crime consummated upon delivery of misbranded drug into interstate

---

[12]    The appellate court did not disturb the grouping of the firearms convictions.

11

commerce) <u>with</u> 21 U.S.C. § 841(a)(crime consummated upon distribution of controlled substance).  The defendant adds: "Had the defendant sold 1, 4 butanediol only for the purpose of cleaning industrial equipment, her actions would not have violated either of the statutes in Count I and Count II." (Def.'s Supp. Brief at 7).  Thus, there is a symmetry of intent requirements for Counts I and II.

　　　　　For the foregoing reasons, the court determined that counts 1 and 2 of the indictment are properly grouped pursuant to United States Sentencing Guideline § 3D1.2.

DATED:   September 14, 2005

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE